FILED
United States Court of Appeals
Tenth Circuit

November 9, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAY N. GIANNUKOS,

    Defendant - Appellant.

No. 17-3067

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:15-CR-20016-CM-DJW-1)**
_____

Meredith B. Esser, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the Districts of Colorado and Wyoming, Denver, Colorado, appearing for Appellant.

Carrie N. Capwell, Assistant United States Attorney (Thomas E. Beall, United States Attorney, with her on the brief), Office of the United States Attorney for the District of Kansas, Kansas City, Kansas, appearing for Appellee.
_____

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

    Defendant Jay Giannukos appeals two convictions involving the illegal

possession of firearms. While conducting a parole search of Giannukos's home,

officers found two firearms, methamphetamine, and counterfeiting equipment. A

grand jury indicted Giannukos on four counts: (1) possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); (3) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and (4) counterfeiting Federal Reserve Notes with the intent to defraud, in violation of 18 U.S.C. § 471. A jury convicted Giannukos of all counts. Giannukos appeals his firearm possession convictions (Counts 2 and 3), arguing that the district court gave an erroneous constructive possession jury instruction and that the prosecutor made improper statements during her closing argument. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reach only the instruction issue and REVERSE and REMAND for a new trial.

**I**

On January 15, 2015, officers searched Giannukos's home in response to an anonymous tip that Giannukos was involved in illegal drug and counterfeiting activities. ROA Vol. II at 265–66. At that time, Giannukos was on parole following a prior state felony conviction and his status as a parolee was the legal basis for the search. ROA Vol. I at 19. Two other people lived with Giannukos in the three bedroom house. ROA Vol. II at 154–57, 337. One bedroom was used as a home office. Another was shared by Giannukos and his girlfriend Ashley Humerickhouse. The third belonged to Giannukos's friend Johnny Chipps. Giannukos, Chipps, and Humerickhouse were at the house during the search, as was James Lutz, a friend whom Giannukos had hired to do work on the house. *Id.* at 108, 111.

2

In the living room of the house, which was accessible to all occupants of the house, the officers found a .22-caliber revolver inside a drawer of a blue hutch. *Id.* at 175–81. In the first bedroom—used as a home office—the officers found counterfeit currency and equipment to create counterfeit currency, as well as two digital scales, one of which was near a metal spoon with white powder residue. *Id.* at 160–65. In the second bedroom—belonging to Giannukos and Humerickhouse—the officers found a black cloth bag containing a total of 10.87 grams of 91.7% pure methamphetamine, distributed between five small Ziplock bags. *Id.* at 205–07, 308–12. They also found a yellow bag containing a small Ziplock bag of .28 grams of methamphetamine. *Id.* at 205–07, 314. There was a pink bag in a drawer beneath the right side of the bed. *Id.* at 190. Inside the pink bag, the officers found a firearm holster containing a Smith & Wesson magazine with eight rounds. *Id.* at 190–92. Next to the pink bag, the officers found a .40-caliber Smith & Wesson firearm. *Id.*

A grand jury returned a four-count indictment, which included the two firearms charges at issue in this appeal: possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The case was tried to a jury. Three witnesses' testimonies are relevant to this appeal.

First, Lutz testified about the work he had been hired to do at the house and the firearm found in the bedroom that Giannukos shared with Humerickhouse. Lutz explained that Giannukos had hired him to make various repairs around the house, including the installation of a lock on the front door. ROA Vol. II at 266–67.

3

According to Lutz, Giannukos "wanted to make sure that the house was a little bit more secure" because he was upset about a recent incident when someone broke into the house and shot his dog. *Id.* at 267.

Lutz also testified that, on the evening of January 14th, Humerickhouse gave him a tour of the house and showed him some work that she wanted done in the bedroom she shared with Giannukos. *Id.* at 269–70. While in the bedroom, Lutz saw a black and silver .40-caliber Smith & Wesson firearm under a dresser. *Id.* at 272. Lutz picked up the firearm, removed and reinserted the loaded magazine, and then placed the firearm back where he found it. *Id.* at 272–73. Lutz testified that Giannukos was in the shower when he handled the firearm. *Id.* at 273–74.

The government later called Special Agent R.J. Cook to impeach Lutz's testimony about Giannukos's whereabouts when Lutz was in the bedroom. Special Agent Cook testified that, during a previous interview, Lutz said that Giannukos was in the bedroom—not the shower—when Lutz handled the firearm. *Id.* at 546–47.

Next, Humerickhouse testified about the recent break-in and the firearm found in the bedroom she shared with Giannukos. Humerickhouse recounted that she was in her bedroom on the evening of January 1st when an unknown man entered the house, shot open the bedroom door, shot and killed Giannukos's dog, demanded drugs and money from Humerickhouse, attempted to remove a safe from the bedroom, and then left the house. *Id.* at 345–53. Humerickhouse testified that this traumatic event "dramatically" changed "everything," including her relationship with Giannukos. *Id.* at 356.

4

When the questioning turned to the subject of the firearm found in the bedroom, Humerickhouse's testimony was less coherent. Humerickhouse acknowledged her ownership of the pink bag containing a firearm holster and a Smith & Wesson magazine, but denied putting either the holster or the magazine in the bag. *Id.* at 376–77. Humerickhouse also denied putting the .40-caliber Smith & Wesson firearm under the bag, *id.* at 378, or ever handling the firearm, *id.* at 384. When shown a photograph of the firearm, Humerickhouse testified that she did not recognize it. *Id.*

In an effort to refresh Humerickhouse's memory, the prosecutor asked her whether she remembered having a conversation with Detective Dylan Passinese on January 15th in which she told him that Giannukos acquired a black and silver .40-caliber firearm after the January 1st break-in. *Id.* at 380–84. Humerickhouse testified that she did not remember her conversation with Detective Passinese. *Id.* The prosecutor then showed Humerickhouse a transcript of her conversation with Detective Passinese; Humerickhouse still did not remember the conversation, but acknowledged that the transcript indicated that she had given a statement about Giannukos owning a firearm. *Id.*

Humerickhouse said that she had trouble remembering her conversation with Detective Passinese because she "was under the influence of drugs and . . . hadn't slept in days" when she spoke with him on January 15th. *Id.* at 382. Detective Passinese then testified about Humerickhouse's demeanor during their conversation. He saw no indication that she was under the influence of drugs. *Id.* at 595. Rather,

5

in his opinion, she "was calm, she was fine, [she] had no issues." *Id.* The jury also heard the audio recording of Humerickhouse's interview with Detective Passinese. *Id.* at 603.

Finally, expert witness Ross Capps testified about his analysis of the DNA on the two firearms found during the search of Giannukos's home. Capps explained that DNA testing of the revolver from the living room found "at least three individuals with male contribution." ROA Vol. II at 533. While Capps could not exclude Giannukos as a contributor, "almost 99 percent of the population would not be excluded." *Id.* at 537. With respect to the firearm found in the bedroom, Capps testified "that the major contributor of DNA was female" and that "Giannukos is excluded as that major source." *Id.* at 539. But, like "approximately 99 percent of the population," "Giannukos could not be excluded" as a minor source. *Id.* at 540–41.

After the close of evidence, the district court instructed the jury, including on the definition of possession (Instruction No. 14):

> The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has the power at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

ROA Vol. I at 246.

6

The jury found Giannukos guilty on all four counts. The district court sentenced Giannukos to 322 months' total imprisonment: 240 months' imprisonment on Count 1; 60 months' imprisonment on Count 2, to be served consecutively to Count 1; 22 months' imprisonment on Count 3, to be served consecutively to Count 2; and 240 months on Count 4, to be served concurrently with Count 1. Giannukos was also sentenced to 3 years' supervised release on each count, to be served concurrently with each other. Giannukos timely appealed his convictions on the firearms counts, Counts 2 and 3.

## II

Giannukos argues that his convictions on Counts 2 and 3 should be reversed, and this case remanded for a new trial, because the district court improperly instructed the jury on the definition of constructive possession. The government agrees that the jury instruction was erroneous, but argues that the error does not warrant reversal.

We review for plain error because Giannukos did not object to the jury instruction in the district court. *United States v. Benford*, 875 F.3d 1007, 1016 (10th Cir. 2017). Plain error review has four prongs:

> First, there must be an error that has not been intentionally relinquished or abandoned. Second, the error must be plain—that is to say, clear or obvious. Third, the error must have affected the defendant's substantial rights, which in the ordinary case means he or she must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different. Once these three conditions have been met, [we] should exercise [our] discretion to correct the forfeited error if

7

the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (citations and quotation marks omitted).

## A

The parties agree that the district court erred and that the error was plain. The district court instructed the jury that "[a] person who, although not in actual possession, knowingly has the power at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it." ROA Vol. I at 246. This instruction was erroneous because "constructive possession also requires *intent* to exercise control." *Benford*, 875 F.3d at 1017 (citing *United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016)). The error was plain because the "omission of the intent element . . . is 'clearly contrary to the law at the time of appeal.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)).

## B

To satisfy the third prong of the plain error test, Giannukos "has the burden to 'show a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Id.* (quoting *Molina-Martinez*, 136 S. Ct. at 1343). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks omitted). "When a district court gives a legally incorrect jury instruction on the principal elements of the offense or a defense, we

8

often have concluded that the legal error affected the outcome of the trial proceedings." *Id.* (quoting *United States v. Duran*, 133 F.3d 1324, 1333 (10th Cir. 1998)).

**1**

We have twice analyzed whether a similarly erroneous constructive possession instruction affected a defendant's substantial rights when the firearms at issue were recovered from a jointly occupied space. *Benford*, 875 F.3d at 1017; *United States v. Simpson*, 845 F. 3d 1039, 1061–62 (10th Cir. 2017). In both cases we concluded that "a reasonable probability exist[ed] that, had the jury been instructed on the intent element, it would not have convicted" the defendant. *Benford*, 875 F.3d at 1017; *see also Simpson*, 845 F.3d at 1061–62. We explained "that, in joint occupancy cases, sufficient evidence that the defendant knew of and had access to firearms may not be sufficient to also show he intended to exercise dominion and control of them." *Benford*, 875 F.3d at 1020 (referencing *Simpson*, 845 F.3d at 1061–63). We reach the same conclusion here.

In *Benford*, the defendant lived in an apartment with his girlfriend. *Id.* at 1010–11. Pursuant to a search warrant, police searched the defendant's apartment and found a Lorcin pistol with a pink grip in an open computer bag located in the master bedroom. *Id.* at 1011. When the police confronted the defendant about the handgun, the defendant responded, "I guess I'll have to take the charge." *Id.* The police also learned that, nineteen days before his arrest, the defendant had a confrontation with his neighbor. *Id.* In the confrontation, the defendant told his

9

girlfriend to "go get a gun," and when she returned, the defendant pointed a black handgun in his neighbor's face. *Id.* at 1011–12. Based on the presence of the Lorcin pistol, the jury convicted the defendant of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *Id.* at 1010. But the district court "failed to instruct" the jury that the defendant "must have intended to exercise control over the pistol." *Id.* at 1016.

We "conclude[d] a reasonable probability exist[ed] that a properly instructed jury would not convict [the defendant] of constructively possessing the Lorcin pistol, and thus, the jury instruction error affected [the defendant]'s substantial rights." *Id.* at 1019. We reached this conclusion for two reasons. First, we found that a reasonable jury could have believed alternative explanations for all of the evidence linking the defendant to the handgun. *Id.* ("For example, [the defendant]'s lack of surprise upon hearing about the Lorcin pistol is a strong indication he knew the firearm was in the bedroom, but a jury might not make the additional step to conclude that he also intended to exercise control over it."). Second, we stressed how the defendant "jointly occupied the bedroom" with his girlfriend, which shed "even more doubt on [the defendant]'s intent to exercise control over the pistol." *Id.* We illustrated this point with an analogy:

> Take, for example, another item officers found plainly visible in the bedroom: [the girlfriend]'s purse, which officers found on top of the bed. Given the fact that the purse was plainly visible on the bed in a bedroom [the defendant] shared with [his girlfriend], one could easily conclude [the defendant] knew of and had access to it, but it is harder to say that [the defendant] also intended to exercise control over it.

10

*Id.* Because the government failed to present sufficient evidence of the defendant's intent to exercise control over the Lorcin pistol, we determined the erroneous constructive possession instruction affected the defendant's substantial rights. *Id.*

Similarly, in *Simpson*, the defendant jointly occupied a house with his wife. 845 F.3d at 1061. Police conducted a search of the defendant's house and found shotguns and ammunition in the defendant's garage, as well as handguns and ammunition throughout the defendant's house. *Id.* After a trial, the jury convicted the defendant on two counts of unlawful possession of an unregistered shotgun and ammunition, and an additional ten counts of unlawful possession of handguns and ammunition. *Id.* But the district court gave an erroneous constructive possession instruction that did not require intent to exercise control over the firearm. *Id.* at 1059–60. The defendant appealed, and we reviewed for plain error. *Id.*

We reached different conclusions as to the shotgun offenses and the handgun offenses. Regarding the two shotgun counts, we relied on uncontradicted testimony that the defendant "had admittedly held the shotgun and tried to sell it about a month prior to his arrest." *Id.* at 1061. Because of that testimony, we "believe[d] that a properly instructed jury would probably have arrived at the same result"—that the defendant intended to exercise control over the shotgun—and thus the defendant "failed to satisfy the third element of the plain-error test on his challenge to" the shotgun offenses. *Id.* But as to the handgun offenses, we identified the locations where the handguns were found, and emphasized that the defendant "jointly occupied

11

each of these locations with his wife, and visitors had access to these places." *Id.*

The only evidence linking the defendant directly to the handguns was the testimony

of an informant—whom the defendant impeached at trial—and the defendant's

admission that he handled the handguns at some point. *Id.* at 1062. We reasoned that

"[t]he jury may or may not have decided to credit the testimony of the informant,

considering that [the defendant] had elicited evidence bearing on impeachment," and

"the jury could have concluded that [the defendant] had handled the handguns at a

time different than that alleged in the indictment." *Id.* We held that, "[i]n these

circumstances, the instructional error affected [the defendant]'s substantial rights on"

the handgun offenses. *Id.*

Here, Giannukos lived in a house with Humerickhouse (his girlfriend) and

Chipps (his friend). ROA Vol. II at 333–39. Police found two firearms in

Giannukos's house: (1) a .22-caliber revolver inside a hutch in the shared living

room; and (2) a .40-caliber pistol next to a pink bag in the bedroom shared by

Giannukos and Humerickhouse. *Id.* at 175–81, 190–92. As in *Benford* and *Simpson*,

the lack of evidence relating to Giannukos's specific intent to exercise control of

either firearm "undermine[s] confidence in the outcome," *Benford*, 875 F.3d at 1017

(quotation omitted).

To prove Giannukos intended to exercise control of the firearms, the

government argues (1) the guns were in plain view and easily accessible to

Giannukos, and (2) he was motivated to exercise control of a gun after someone

12

robbed his house. This blurs the distinction between the facts pertaining to each firearm and fails to link Giannukos to either firearm.

First, as to the .22-caliber revolver, it was found in a hutch in the living room—a common area accessible to Giannukos, Humerickhouse, and Chipps. ROA Vol. II at 175–81. The revolver had male DNA on it, *id.* at 537, but both Giannukos and Chipps are male and both had access to the living room hutch. Nothing else connected Giannukos to the revolver. This is even less evidence than was presented in *Simpson*, where the defendant admitted to handling the relevant handguns, 845 F.3d at 1062, or the evidence in *Benford*, where the defendant had recently pointed a handgun in his neighbor's face, 875 F.3d at 1011–12. Here, there is no evidence that Giannukos ever handled the revolver found in the living room; there is only evidence that he had access to the revolver.

Second, as to the .40-caliber pistol, the police found it next to a pink bag, and the pistol's holster and ammunition were inside the pink bag. ROA Vol. II at 190–92. The firearm had primarily female DNA on it. *Id.* at 539. The government's DNA expert testified that "Giannukos is excluded as that major source." *Id.* Although Giannukos's house was robbed two weeks prior to the police search, Giannukos was not home—Humerickhouse was. *Id.* at 346. The intruder pointed a gun at Humerickhouse, took Humerickhouse's money, and shot a dog in front of Humerickhouse. *Id.* at 346–48. Whatever theoretical motivation Giannukos had to possess a gun after the robbery, Humerickhouse had the same motivation, if not more.

13

As we said in *Benford*:

> The jury could reasonably conclude from this evidence that [the defendant] knew of and had access to the firearm[s]—and in fact the jury made just that conclusion when it convicted [the defendant] under our pre-*Little* standards—but a properly instructed jury would not be compelled to also conclude [the defendant] intended to exercise control over the firearm[s] based on this evidence.

875 F.3d at 1019. The same is true here. As a result, Giannukos has met his burden to show "a reasonable probability exists that a properly instructed jury would not convict [him] of constructively possessing the [firearms], and thus, the jury instruction error affected [his] substantial rights." *Id.*

**2**

The government argues that this case is distinguishable from *Benford* and *Simpson*, where the defendants challenged their convictions for violating 18 U.S.C. § 922(g)(1), because Giannukos was also convicted of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Aplee. Br. at 22. To convict Giannukos of violating § 924(c), the government needed to prove that he "possessed one or both of the firearms . . . in furtherance of [the] crime" of "possession with intent to distribute methamphetamine." ROA Vol. I at 241 (Instruction No. 10). "Possession 'in furtherance of' means for the purpose of assisting in, promoting, accomplishing, advancing, or achieving the goal or objective of the underlying offense." *Id.* The government's position is that the "jury's finding . . . that Giannukos possessed a firearm in furtherance of drug trafficking necessarily

14

subsumed a finding that Giannukos intended to exercise control and dominion over the firearm." Aplee. Br. at 24.

We are not persuaded. Even assuming Instruction No. 10's "in furtherance of" language requires intent, it would require "intent to further the drug trafficking crime," not "intent to exercise dominion or control over the firearms." As we explained in *Little*, the intent required to convict must be more precise. In *Little*, the district court instructed the jury that "constructive possession exists when a person not in actual possession 'knowingly has the power at a given time to exercise dominion or control.'" 829 F.3d at 1181 (quoting the Tenth Circuit Criminal Pattern Jury Instruction § 1.31 (2011)). "[A] different instruction defined the word 'knowingly' as 'voluntarily and intentionally.'" *Id.* at 1182. We rejected the government's argument that "there was no error because . . . the . . . instruction that constructive possession required knowledge and control effectively required intent." *Id.* at 1182–83.

> [R]eading these instructions together, the jury was informed that constructive possession requires that a defendant voluntarily and intentionally have the power to exercise dominion or control over an object. Intentionally having the power to exercise dominion is not the same as intending to exercise dominion. For example, a felon who knows his neighbor keeps a gun in his bedroom and who is given a key to watch his neighbor's house would intentionally have the power to exercise control over the weapon, but would not be guilty of constructive possession without the intent to actually exercise control.

*Little*, 829 F.3d at 1183.

15

When *Little*'s rationale is applied here, we observe a similarly inadequate instruction. If we assume that Instruction No. 10's "in furtherance of" language requires intent, and read that instruction together with the constructive possession instruction, the district court informed the jury that § 924(c) requires the defendant to knowingly have the power to exercise dominion or control over the firearms, with the intent to further his drug trafficking crime. Intending to further a drug trafficking crime, however, is not the same as intending to exercise control over a firearm. For example, Giannukos could know Humerickhouse and Chipps kept firearms in the house, and intend that the presence of those firearms would protect and promote his drug trafficking crimes, but yet never intend to exercise control over the firearms. In such a scenario, Giannukos would expect the guns to help deter future burglaries, even though he never personally intended to control the firearms himself. Given the lack of evidence that Giannukos intended to exercise control over the firearms, this potential scenario undermines confidence in the outcome here.

## C

Having concluded that the erroneous jury instruction affected Giannukos's substantial rights, we turn to the fourth prong of the plain error test. We exercise our "discretion to correct the forfeited error," *Molina-Martinez*, 136 S. Ct. at 1343, when "the error affected the fairness, integrity, or public reputation of the trial," *Benford*, 875 F.3d at 1021. "To satisfy this test, a defendant . . . need[s] to show that the error is particularly egregious and that failure to notice the error would result in a miscarriage of justice." *Simpson*, 845 F.3d at 1062 (quotation marks omitted). But,

16

in cases "involv[ing] a constitutional error," our analysis is "less rigid." *Id.* (quotation marks omitted).

A district court's failure to instruct the jury on an essential element of the crime charged "may have allowed the jury to convict without requiring the government to prove all elements of the crime beyond a reasonable doubt." *Benford*, 875 F.3d at 1021. And, "[i]n light of the revered status of the beyond-a-reasonable-doubt standard in our criminal jurisprudence, a jury instruction that allows a conviction where one important element may not have been found against the defendant by such a standard cannot be overlooked." *Duran*, 133 F.3d at 1334.

In both *Benford* and *Simpson* we concluded that the erroneous constructive possession instruction warranted the exercise of our discretion, satisfying the fourth prong of the plain error test. *See Benford*, 875 F.3d at 1021; *Simpson*, 845 F.3d at 1062 ("[B]ecause the government's evidence on intent was not overwhelming, the instructional error seriously affected the fairness, integrity, or public reputation of the judicial proceedings."). These same concerns compel us to exercise our discretion here. The government's only argument regarding the fourth prong is that "the evidence of Giannukos's intent to exercise control or dominion over at least one of the firearms in his house is overwhelming." Aplee. Br. at 25. But as described above, this is not true.

Because we conclude that the erroneous jury instruction merits remand, we do not reach Giannukos's second issue regarding improper statements by the prosecutor during closing argument.

17

## III

Because the district court plainly erred when instructing the jury, we REVERSE Giannukos's convictions on Counts 2 and 3 of the superseding indictment, and REMAND for a new trial.