**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 15, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

VENG XIONG,

    Defendant-Appellant.

No. 19-5111

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 18-CR-243-CVE)**

---

Leena Alam, Assistant United States Attorney (R. Trent Shores, United States Attorney, with her on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

O. Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the brief), Denver, Colorado, for Defendant-Appellant.

---

Before **TYMKOVICH,** Chief Judge, and **BALDOCK**, and **CARSON**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

With two of his alleged co-conspirators testifying for the Government, a jury convicted Defendant Veng Xiong on one count of conspiring to possess with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846

and 841(b)(1)(A)(viii), one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(B)(i), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Defendant on his first and third convictions (Counts 1 and 4 of a superseding indictment) to concurrent terms of 120 months' imprisonment. On his second conviction (Count 3), the court sentenced Defendant to a consecutive term of 120 months' imprisonment. Defendant now challenges his two firearm-related convictions based on what the Government admits was an erroneous constructive possession charge tendered to the jury. Constructive possession of a firearm is established only when a person lacking physical custody of the firearm "still has the power *and* intent to exercise control over the [firearm]." *Henderson v. United States*, 575 U.S. 622, 626 (2015) (emphasis added). The district court failed to instruct the jury on constructive possession's intent requirement. Defendant says this violated his Sixth Amendment right to a jury trial. *See Neder v. United States*, 527 U.S. 1, 12 (1999) ("[A]n improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee.").

Our jurisdiction arises under 28 U.S.C. § 1291. Because Defendant did not challenge the instruction in the district court, we review only for plain error. Fed. R. Crim. P. 52(b). Before an error that is plain or obvious may warrant reversal (assuming the claim of such error was not intentionally relinquished or abandoned), the error must have affected Defendant's substantial rights. This means Defendant

2

"must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (internal quotations omitted). Because Defendant has not met his burden, we affirm.

I.

A confidential informant by the name of "Jimmy" worked with the Osage County Drug Task Force in and around Tulsa, Oklahoma. Jimmy had purchased small quantities of marijuana from an individual named Ken Lee on multiple occasions. At Defendant's trial, Lee testified that in early April 2018, Jimmy contacted him about purchasing 33 pounds of methamphetamine for half a million dollars. Lee had never sold methamphetamine, or any drug in such a large quantity, so he inquired within his local Hmong community about a possible source for the drugs. Lee was put in touch with an individual known as "Trigger." On the evening of April 8, 2018, Lee went to Lady Godiva's, a Tulsa strip club, to meet Trigger. Xiongkou Her, a friend living with Lee and his family, accompanied Lee to the club. Meanwhile, Defendant Xiong and another individual by the name of Kosh Lor accompanied Trigger. Lee spoke alone outside the club with Trigger, Defendant, and Lor. Lee left the club understanding Defendant would procure the methamphetamine from one of his connections.

Defendant texted Lee around this time: "This Trigs homeboy i talk to u earlier don't like to tex. Call me when you can." Lee testified he and Defendant met at

3

Defendant's home, 8577 East 32nd Place, on the afternoon of April 9. Inside his garage, Defendant showed Lee a pound of methamphetamine. Lee sent Jimmy a picture of the drugs, and Jimmy sent Lee a picture of $100,000. Jimmy and Lee made plans to complete the transaction that night in a rural area about 70 miles north of Tulsa. While Lee and Defendant were still inside the garage, Defendant handed Lee two handguns that Lee saw Defendant retrieve from the backseat of his four-door silver Buick. In addition to the handguns, which Lee described as a "revolver" and "Glock 22," Lee saw an "AK-47" and "shotgun" in the backseat of Defendant's Buick. Lee took the two handguns from Defendant and departed.

Later that evening, Defendant texted Lee an unfamiliar address on Pine Street at which to meet him. Lee and Her took the two handguns and drove to the address in a two-door black Acura, where they met Defendant and Lor. Lee and Her followed Defendant and Lor, the latter driving Defendant in his Buick, to a nearby Chinese Restaurant. From a safe distance, Lee and Her saw a man exit the restaurant and get into Defendant's Buick. After five or ten minutes, the unidentified man got out of the car. Lee and Her then followed Defendant and Lor back to the Pine Street residence. Lee saw Defendant carry a Converse shoebox from his Buick into the house. Once the four men were inside, Defendant and Lee went alone into a "back room" where Defendant packed around five pounds of methamphetamine into five ziplock bags. Defendant then placed the drugs inside a black duffel bag. Lee took the bag and put it in the Acura. The four men departed for the delivery

4

point with Her driving Lee in the Acura and Lor driving Defendant in the Buick. On the way, Lee texted Defendant to inquire about the remaining twenty-eight pounds of methamphetamine. Defendant called Lee and told him that if the five-pound transaction went smoothly he would have "his guys bring the rest."

At the planned delivery point, law enforcement set up a "bait car," an unoccupied parked vehicle left running with the lights on. The "take-down team" (TDT) positioned itself about a quarter mile to the east of the delivery point. A "sniper observation team" (SOT) was about sixty yards from the delivery point at the back side of the bait car. At approximately 10:30 p.m. on April 9, Her pulled the Acura off the highway facing north behind the bait car. Lor parked the Buick to the left side of the Acura a bit farther back from the two vehicles. At that point, Sergeant Denise Silva, a member of the SOT, gave the TDT the go-ahead to move in. A video of the takedown indicates that as the TDT rapidly approached in multiple vehicles, Lor, in response to the flashing lights, promptly exited Defendant's Buick and lay prostrate on the ground. When the Buick's dome light lit up, Sergeant Silva saw through her rifle scope what appeared to be the pistol grip or buttstock of a firearm positioned between the front passenger's seat and center console of the Buick. She alerted the TDT to a likely weapon. Officer Nick Silva, a member of the TDT, and numerous other officers advanced on the Buick that Lor had exited. Officer Silva shined his flashlight into the vehicle and made eye contact with Defendant, who was in the front passenger's seat of the Buick. After Defendant

5

raised his hands above his head as ordered, Silva clearly observed the buttstock of what later was identified as a WASR-10 semi-automatic rifle, a Romanian knockoff of the AK-47. The TDT placed all four men in custody without incident.

Between the center console and front passenger's seat of Defendant's Buick, officers located the upside down WASR-10 with the pistol grip pointing upwards for ready access. Officers also recovered a fully-loaded, thirty-round magazine for the WASR-10 on the front passenger's seat floorboard. In the front passenger's door pocket, officers found a round of ammunition for the WASR-10 with damage to its polymer tips, as well as Defendant's cell phone on which he had been communicating with Lee and others. Officer Wilmott, commander of the TDT, testified "it appeared that someone had tried to charge the [WASR-10], the round got jammed, so they stripped the magazine as you would to clear the jam, [and] racked the round open causing it to eject to the right."

Behind the driver's seat of the Buick on the floorboard, officers located a loaded and chambered short-barreled Winchester 12-gauge shotgun with the handle positioned behind the center console facing the front passenger's seat as shown in Government's Trial Exhibit 9 attached hereto. FBI Special Agent Hewett testified the shotgun had one round in the chamber and four rounds in the magazine and was "ready to fire at the press of a trigger." Officer Wilmott testified Defendant had easier access to the shotgun from his front passenger's seat than Lor did from the driver's seat given the gun's placement behind the driver's seat: "It would be

6

difficult for the driver to access [the shotgun] without exiting the vehicle." Unlike Lor, who would have had to turn the shotgun around to access it while seated in the driver's seat, Officer Silva testified Defendant could have reached behind the seat and pulled the shotgun up directly from his position in the passenger's seat.

Inside the Acura's rear hatch, officers uncovered approximately five pounds of methamphetamine consisting of five bundles, one inside a Converse shoebox. Two handguns were also recovered from or near the Acura. Just outside the passenger's door on the ground was a Taurus .38 revolver. Under the driver's seat was a Glock model 22, .40 caliber handgun. Lee testified these were the same handguns Defendant retrieved from the backseat of his Buick and handed Lee earlier that day. Her testified Lee gave him the Glock before they departed Lee's residence for the Pine Street address. Her then placed the handgun under the driver's seat.

## II.

In Count 1 of a superseding indictment, a grand jury charged Defendant and the other three men, Lee, Her, and Lor, with conspiring to possess with intent to distribute 500 or more grams of methamphetamine. Count 2 did not charge Defendant, but rather charged Lee and Her with possession in furtherance of a drug trafficking crime of the Taurus revolver and Glock handgun found in or about the Acura. Meanwhile, Count 3 charged Defendant and Lor with possession in furtherance of a drug trafficking crime of the short-barreled Winchester shotgun and WASR-10 semi-automatic rifle found in Defendant's Buick. Finally, Count 4

7

charged Defendant alone with being a felon in possession of all four firearms. Only Defendant went to trial, and a jury convicted him on all applicable counts. Defendant now appeals his firearm-related convictions on Counts 3 and 4.

Everyone agrees that to convict Defendant under either 18 U.S.C. § 922(g)(1) (felon in possession) or § 924(c)(1) (possession in furtherance of a drug trafficking offense), the Government had to prove beyond a reasonable doubt that, among other things, Defendant possessed, actually or constructively, at least one of the firearms identified in the respective counts. The jury instruction defining "possess" and "possession," in particular its second paragraph which omits the intent requirement for constructive possession, is at the center of this controversy. The instruction reads in relevant part:

> The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has the power at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.
>
> More than one person can be in possession of an object [*i.e.*, joint possession] if each knows of its presence and had the power and intention to control it.

The Government concedes that omission of the intent requirement from this instruction's second paragraph was an obvious error that satisfies the first two

8

preconditions for plain error. *See United States v. Little*, 829 F.3d 1177, 1182 (2016) ("In *Henderson*, the [Supreme] Court squarely held that constructive possession requires both power to control an object and intent to exercise that control."). But to establish plain error, Defendant must show the district court committed an error that not only was clear or obvious under current law but also affected his substantial rights, meaning a reasonable probability exists that, but for error, the result of the proceeding would have been different. *Molina-Martinez*, 136 S. Ct. at 1343. If Defendant satisfies these criteria, the Court should then exercise its discretion to correct the error if such error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

A.

We begin our analysis by considering Defendant's conviction on Count 4 for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Lee testified that while inside Defendant's garage on April 9, 2018, the date charged in the indictment, he saw four firearms, including two handguns, in the backseat of a Buick registered to Defendant. Lee identified photographs of all four firearms at trial. According to Lee, Defendant handed him the two handguns later found in or near the Acura, which means that if the jury credited Lee's testimony, Defendant held the two handguns at least briefly. This is enough to establish Defendant's direct physical control over or actual possession of the handguns. To convict for actual

9

possession, Defendant need only "have held [an identified] firearm for a mere second or two during the time specified in the indictment." *United States v. Samora*, 954 F.3d 1286, 1290 (10th Cir. 2020) (internal quotations omitted).

At closing, the Government's principal argument regarding Count 4 was that Defendant was in actual possession of the four firearms located in the Buick on April 9. Defendant posits, however, the jury likely did not convict him of actually possessing any of the guns, including the two handguns. Defendant tells us "the only witness who put the guns in [his] hands was Lee," and Lee chose to forego trial and cooperate with the Government. To prove his point, Defendant says Lee incredulously testified on cross-examination that the Government offered him nothing in return for his testimony. But considering the record as a whole, the fact Lee was the only Government witness to testify about Defendant's handling of the handguns does not mean the jury was unlikely to have convicted him based on his actual possession of one or both of those firearms.

We have explained more than once that a conviction may stand on the uncorroborated testimony of an accomplice. *E.g.*, *United States v. Dewberry*, 790 F.3d 1022, 1029 (10th Cir. 2015); *United States v. Magallanez*, 408 F.3d 672, 682 (10th Cir. 2005). This follows from the well-established precept that credibility challenges are generally disfavored on appeal because matters of credibility are within the exclusive province of the jury. *Dewberry*, 790 F.3d at 1029; *Magallanez*,

10

408 F.3d at 682. "We will not hold that testimony is, as a matter of law, incredible unless it is unbelievable on its face, i.e., testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." *Dewberry*, 790 F.3d at 1029 (internal brackets omitted) (quoting *United States v. Mendez-Zamora*, 296 F.3d 1013, 1018 (10th Cir. 2002)). Consistent with our case law, the district court in this case instructed the jury that "the testimony of an alleged accomplice may, by itself, support a guilty verdict," but "you should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt."

That the jury found Defendant guilty on Count 1, the drug conspiracy charge, demonstrates that, in all likelihood, the jury deemed Lee's trial testimony credible. Lee was the primary witness to testify about the details of the conspiracy and the only witness to testify about the source of the two handguns found in or near the Acura. Lee testified he met with Defendant, Lor, and Trigger on April 8 to seek assistance in obtaining the methamphetamine. Lee then testified that, the next day, Defendant gave him the Glock handgun and Taurus revolver before obtaining methamphetamine from one of his connections and providing the drugs to Lee so he could sell them to Jimmy.

Her's testimony regarding the conspiracy was consistent with Lee's testimony, but not nearly as detailed or damaging to Defendant. On direct examination, Her

11

testified he accompanied Lee to the strip club on April 8 where Lee met Defendant, Lor, and Trigger.  But when asked if he recalled "anything of significance happening that night other than being introduced to those people," Her answered "[n]o."  Her testified Lee gave him a Glock handgun the next day, April 9, before the two set off from Lee's house.  Outside a Chinese restaurant, Her witnessed a man from a distance get in Defendant's Buick for a brief time before Lee and Her followed Defendant and Lor back to the Pine Street residence.  Her testified he saw Defendant carry a Converse shoebox inside the house.  But after all four men went inside the house, Her and Lor stayed in the living room while Defendant and Lee went to a "back room."  Upon preparing to depart, Her witnessed Defendant giving Lee a black duffel bag and heard Lee tell Defendant "it was his [Lee's] problem."

On appeal, Defendant claims Her's testimony "substantially corroborated" Lee's testimony regarding the drug conspiracy.  Thus, one cannot tell whether the jury found Lee's uncorroborated testimony regarding the handguns credible.  On cross-examination, however, Her stated he never saw any drugs and had no idea where Lee had gotten the Glock.  Nor did Her have any idea who Trigger was.  Lee provided Her with no information about the methamphetamine, telling him "it was just a package."  Lee did show Her a picture of the $100,000, describing the situation as "my deal and my problem."  Based on Her's testimony, Defendant at trial argued directly the opposite of what he now argues on appeal.  In his closing argument,

12

Defendant told the jury Her's testimony did not corroborate Lee's testimony and the jury could only convict Defendant on the drug conspiracy if it found Lee credible:

> [T]he Government has to prove beyond a reasonable doubt that [Defendant] knew the objective of the conspiracy. That only comes from Ken Lee. If you reject Ken Lee, there's at least a reasonable doubt as to whether [Defendant] knew what was going on and that he knowingly and voluntarily involved himself in the conspiracy. Again, that only comes from Ken Lee. The other person we heard from is Mr. Her and he said, "I didn't see any guns, I didn't see any drugs. The only thing I got was from Ken Lee; Ken Lee said it was my deal and my problem." Where's the evidence as to [Defendant]?"
>
> [Defendant] also has . . . to agree with another person to knowingly and intentionally possess a controlled substance. That's the object of the conspiracy; there's got to be proof beyond a reasonable doubt that [Defendant] did that. All you've got is Ken Lee. That's it.

Defendant's characterization of the evidence before the jury was more accurate than it is before us. *See United States v. Bader*, 678 F.3d 858, 869 (10th Cir. 2012) (examining on plain error review the "probable prejudicial impact" of a jury instruction "within the context of the entire trial," including closing arguments).

Defendant cites *United States v. Simpson*, 845 F.3d 1039 (10th Cir. 2017), where we considered a similarly faulty constructive possession instruction, to bolster his attack on Lee's credibility. Defendant portrays Lee as an informant whose testimony should be discounted based on our observation in *Simpson* that "[t]he jury may or may not have decided to credit the testimony of the informant, considering that [defendant] had elicited evidence bearing on impeachment." *Id.* at 1062. But *Simpson* is inapposite. In that case, the defendant, a convicted felon, was charged

13

after execution of a search warrant with, among other things, possession of two handguns. One of the handguns was found in an unlocked safe in the basement of a home the defendant jointly occupied with his wife. The other was found under the driver's seat of a car registered to his wife. *Id.* at 1061. A police officer testified the defendant admitted to holding each of the charged handguns, but not necessarily on or about the date alleged in the indictment. Additionally, an informant testified he had seen the defendant holding and brandishing firearms in the past. But whether the informant's testimony was credible was beside the point because nothing in our decision suggests that the firearms about which the informant testified were the handguns identified in the indictment or that the defendant held and brandished such handguns on the date alleged in the indictment.

Therefore, the jury in *Simpson* could have found both the informant's and police officer's testimonies credible and still have reasonably concluded that the defendant had not actually or constructively possessed the charged handguns on or about the date alleged in the indictment. Unlike the facts in *Simpson*, Lee was not a police informant testifying about a collateral, albeit relevant, matter, but an alleged co-conspirator providing direct evidence about clearly identified firearms readily available to facilitate an imminent drug deal. Lee's testimony about the details of the drug conspiracy was specific, including his testimony that Defendant handed him the two handguns at issue on April 9, the date alleged in the indictment.

14

Considering the entirety of the trial record, none of Defendant's arguments persuade us that the jury's verdict on the felon-in-possession count would have been any different had the jury been properly instructed on constructive possession. *See Molina-Martinez*, 136 S. Ct. at 1343. Lee identified all four firearms recovered at the scene of the arrests—the Glock handgun, Taurus revolver, WASP-10 semi-automatic rifle, and Winchester short-barreled shotgun—as the same firearms he saw in the backseat of Defendant's Buick earlier in the day. He testified that Defendant retrieved the two handguns from the backseat of the vehicle and handed them to him on the afternoon of April 9. Lee also testified that he and Her then took the two guns with them on their ill-fated journey later in the day.

Lee's testimony is entirely consistent with subsequent events, namely law enforcement's recovery of the Glock from underneath the driver's seat of the Acura where Her had been seated, and recovery of the Taurus on the ground just outside the passenger's door of the Acura where Lee had exited the vehicle upon his impending arrest. Lee's testimony is also consistent with recovery of the WASR-10 semi-automatic rifle and short-barreled Winchester shotgun inside Defendant's Buick, where Lee stated he saw Defendant leave them undisturbed earlier in the day. In sum, Defendant has not established a reasonable probability that the jury rejected Lee's testimony that he saw Defendant actually hold the two handguns inside Defendant's garage on April 9. Defendant therefore has not established a reasonable

15

probability that the erroneous constructive possession instruction had any bearing on his Count 4 conviction for being a felon in possession of a firearm. On plain error review, we affirm Defendant's Count 4 conviction under 18 U.S.C. § 922(g)(1).

B.

Next we consider Defendant's conviction on Count 3 for possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(B)(i). Recall Count 3 charged Defendant with illegally possessing both the WASR-10 semi-automatic rifle found between the front passenger's seat and center console of the Buick, and the short-barreled Winchester shotgun found on its backseat floorboard. At oral argument, however, the Government informed us for the first time that, despite the statute's current language, a 1994 amendment to § 924(c)(1)(B)(i) increasing the penalty for possessing a semi-automatic weapon such as a WASR-10 was effectively repealed in 2004 by a sunset provision. *See* Office of Legal Counsel, Department of Justice, *Whether the Ten-Year Minimum Sentence in 18 U.S.C. § 924(c)(1)(B)(i) Applies to Semiautomatic Assault Weapons* (Nov. 24, 2009), http://www.justice.gov/olc/opiniondocs/semiautomatic-weapons.pdf (last visited May 13, 2021).[1] Consequently, the Government now belatedly concedes only Defendant's

---

[1] The applicable statutory language contained in 18 U.S.C. § 924(c)(1) reads:

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law,

(continued...)

possession of the short-barreled shotgun qualifies him for the ten-year mandatory minimum sentence he received. For the purpose of resolving this appeal, we accept the Government's concession as accurately reflecting the law. So if we were to affirm Defendant's Count 3 conviction on the basis of the WASR-10 alone (a lesser-included offense under subsection (c)(1) says the Government), we would need to remand for resentencing based on a five-year mandatory minimum.

Inexplicably then, the Government in its response brief focuses much (not all) of its Count 3 argument on the WASR-10, seemingly oblivious to two critical facts: (1) possession of the WASR-10 no longer qualifies Defendant for the enhanced sentence he received under subsection (c)(1)(B)(i), and (2) Count 3's verdict form tells us the jury's verdict was, at a minimum, based on Defendant's possession of

[1](...continued)
any person  . . . who, in furtherance of [any drug trafficking crime], possesses a firearm, shall, . . .

(i) be sentenced to a term of imprisonment of not less than 5 years; . . . .

(B) If the firearm possessed by a person convicted of a violation of this subsection–

(i) is a short-barreled rifle, *short-barreled shotgun, or semiautomatic assault weapon*, the person sentenced shall be sentenced to a term of imprisonment of not less than 10 years; . . . .

18 U.S.C. § 924(c)(1)(A), (B) (emphasis added). Note under subsection (c)(1)(B)(i), the mandatory minimum 10-year sentence ostensibly applies if the firearm was a "short-barreled shotgun, or semiautomatic assault weapon," both of which Count 4 charged Defendant with possessing.

the short-barreled shotgun. The instructions informed the jury that the parties stipulated the shotgun found on the backseat floorboard of Defendant's Buick was a "short-barreled shotgun" within the meaning of § 924(c)(1)(B)(i). Consistent with the Government's concession on appeal that the subsection no longer covers "semiautomatic assault weapons," the parties did not stipulate that the WASR-10 was such a weapon, and the instructions did not define the statutory phrase for the jury. On the verdict form, the jury was first asked whether it found Defendant guilty or not guilty on Count 3. The jury answered "Guilty." The form then instructed the jury that if it unanimously found Defendant guilty on Count 3, the jury should determine whether the Government "has proven beyond a reasonable doubt that defendant possessed a short-barreled shotgun." In response to the question "[d]o you find beyond a reasonable doubt that defendant possessed a short-barreled shotgun as charged in Count Three," the jury answered "Yes."

We therefore begin our analysis of Defendant's § 924 conviction with the short-barreled shotgun. Once again, Defendant has the burden of establishing a reasonable probability that the outcome would have been different had the jury been properly instructed on constructive possession. *See Molina-Martinez*, 136 S. Ct. at 1343. Defendant argues nothing in the record supports a finding that he had actual possession of the shotgun during the applicable time frame, and the Government makes no significant argument to the contrary. *See Samora*, 954 F.3d at 1295 ("To

18

prove actual possession, the Government was required to show [d]efendant held the firearm on the date specified in the indictment."). This leaves us to consider whether, under a theory of constructive possession, the omission of the intent requirement from the instruction affected Defendant's substantial rights.

According to Defendant, the record evidence to support a finding he intended to exercise control over the shotgun was lacking largely, if not exclusively, due to its location on the backseat floorboard of the Buick he jointly occupied with his driver, Lor. This joint occupation presents a problem for the Government, he says, because "in joint occupancy cases, sufficient evidence that the defendant knew of and had access to firearms may not be sufficient to also show he intended to exercise dominion and control over them." *United States v. Benford*, 875 F.3d 1007, 1020 (10th Cir. 2017). Defendant notes that since the Supreme Court's decision in *Henderson,* we have published four decisions addressing whether a constructive possession instruction omitting the intent requirement constituted plain error. *See Simpson*, 845 F.3d at 1039; *Benford*, 875 F.3d at 1007; *United States v. Giannukos*, 908 F.3d 649 (10th Cir. 2018); *Samora*, 954 F.3d at 1286. Defendant is quick to point out that in all four cases "this Court [held] that the erroneous . . . instruction[] affected the defendant's substantial rights in large part because the defendant did not exclusively occupy the place where the contraband was found."

This is true. What also is true is that we decided each of those cases on the

19

particular record presented, just as plain error's substantial rights inquiry requires us to do here. What makes this case at the outset fundamentally different from those cases on which Defendant relies is its underlying factual predicate. This case involves a drug deal, the details of which unfolded over the course of two days. Defendant agreed to supply Lee with a substantial amount of methamphetamine. Less than 24 hours later, Lee observed the shotgun and three other firearms in the backseat of Defendant's Buick inside Defendant's garage. This was at a time when Defendant, by all appearances, had exclusive control over the vehicle and its contents, including the four firearms. That Defendant reached into the vehicle and retrieved two of the four firearms and handed them to Lee illustrates Defendant's knowledge and control. Just prior to the deal's consummation, that same short barreled shotgun, loaded and ready to fire, lay on the backseat floorboard of Defendant's vehicle in a position readily accessible only to Defendant.

By comparison, *Simpson* involved the execution of a search warrant for a home that the defendant, a convicted felon, jointly occupied with his wife. 845 F.3d at 1061. Officers located one of the subject firearms in an unlocked safe in the basement of the home and the other underneath the driver's seat of a vehicle registered to the defendant's wife. In holding the defendant met his burden of establishing a reasonable probability of a different outcome with the proper instruction, we observed the defendant "jointly occupied each of these locations with

20

his wife, and visitors had access to these places." *Id.* On plain error review, evidence of possession beyond joint occupancy, namely that the defendant held unidentified firearms in the past or even the charged firearms on a date other than that specified in the indictment, was not enough to establish the necessary nexus between the defendant and the charged firearms on the date specified in the indictment.[2]

Similarly, *Benford* involved the execution of a search warrant for an apartment the defendant, also a convicted felon, occupied with his girlfriend. 875 F.3d at 1010–11. In the couple's bedroom, officers seized a firearm plainly visible inside a black computer bag resting next to a bedside night stand. The firearm was a small silver semiautomatic handgun with pink grips. Evidence of the defendant's possession included a three-month-old text message indicating he owned multiple firearms and testimony about an incident nineteen days before his arrest suggesting he possessed a different firearm. The most damaging evidence was the defendant's statement, "I guess I'll have to take the charge," after an officer informed him of the

---

[2] In *Giannukos*, we erroneously stated that "[t]he only evidence linking the defendant [in *Simpson*] directly to the handguns was the testimony of an informant[.]" 908 F.3d at 656. This is a misreading of *Simpson*, where we noted "a police informant testified he had seen [the defendant] discussing, holding, and brandishing firearms." *Simpson*, 845 F.3d at 1062. We did *not* identify the firearms about which the informant testified as the firearms specified in the applicable counts. The Government did present a police officer's testimony linking Simpson to the charged handguns, but not on a date on or about that specified in the indictment. *Id.*

firearm and he waived his *Miranda* rights. But the officer who heard the statement admitted "'infinite possibilities'" existed as to its meaning. *Id.* at 1018–19. We concluded a reasonable jury could have found the defendant knew of and had access to the firearm without the necessary intent to exercise control over it:

> Take, for example, another item officers found plainly visible in the bedroom: Ms. Galloway's purse, which officers found on top of the bed. Given the fact the purse was plainly visible on the bed in a bedroom [the defendant] shared with Ms. Galloway, one could easily conclude [the defendant] knew of and had access to it, but it is harder to say that [the defendant] also intended to exercise control over it. A jury might likewise question whether [the defendant] intended to exercise control over the small silver pistol with pink grips.

*Id.* at 1019.

The third published decision on which Defendant relies, *Giannukos,* involved the warrantless search of a residence occupied by the defendant-parolee, his girlfriend, and a roommate. 908 F.3d at 651. Officers found one of the firearms at issue inside the drawer of a blue hutch located in a living room accessible to all occupants of the home. While DNA evidence taken from the first firearm could not exclude the defendant as a male contributor, "'almost 99 percent of the population would not be excluded.'" *Id.* at 653. Officers found the second firearm at issue in a drawer next to the bed in the bedroom the defendant occupied with his girlfriend. The major contributor of the DNA found on this firearm was female, with the defendant once again among "99 percent of the population" that could not be excluded as a minor contributor. *Id.* And while the defendant could have been

22

motivated to possess a gun by a home robbery that occurred two weeks earlier, his girlfriend had the exact same motivation. In fact, she was present during the robbery, but the defendant was not. *Id*. at 656 ("Whatever theoretical motivation [the defendant] had to possess a gun after the robbery, [his girlfriend] had the same motivation, if not more."). We concluded that the lack of evidence bearing on the defendant's intent to exercise control over either firearm undermined confidence in the outcome. Therefore, the defendant had shown a reasonable probability of a different outcome if the jury had been properly instructed on constructive possession's intent requirement. *See Benford*, 875 F.3d at 1017 (equating a reasonable probability of a different outcome with a probability sufficient to undermine confidence in the outcome).

Lastly, the defendant in *Samora* was arrested pursuant to an outstanding warrant, but not before he attempted to flee on foot from a restaurant's parking lot. 954 F.3d at 1289. Officers searched the vehicle he had been driving and found a loaded firearm in the closed center console. Because the defendant had borrowed the car from his ex-girlfriend, we considered the case as one of joint occupancy. The ex-girlfriend testified she owned the firearm and had placed it in the center console of her vehicle. But she could not identify the firearm's make or model or explain why the firearm was in her vehicle when she had purchased it for home protection. DNA evidence demonstrated the defendant had handled the firearm at some point, but

23

neither party presented evidence as to when. Relying on *Simpson* and *Benford*, we held "this evidence without more [was] not sufficient to convince us the jury would have reached the same conclusion if properly instructed" on constructive possession. *Samora*, 954 F.3d at 1294.

We acknowledge that the four cases on which Defendant relies stand for two propositions applicable in this instance: Because Defendant and Lor jointly occupied the Buick for a substantial period of time until just seconds before their arrests, the Government (1) could not rely on Defendant's occupancy of the Buick alone to establish his intent to exercise control over the short-barreled shotgun, but (2) had to present additional evidence, beyond mere proximity, establishing a connection or nexus between Defendant and the shotgun.[3] *Id.* But this is where the benefit of those cases to Defendant ends. Unlike each of those cases, this case involves the presence of firearms designed to ensure the execution of a drug transaction set to occur within moments if not seconds. The presence of a short-barreled shotgun

---

[3] One must be careful not to conflate joint occupancy of the Buick with joint possession of the shotgun. The Government points out that the third paragraph of the jury instruction defining "possession," states "[m]ore than one person can be in possession of an object if each knows of its presence and had the power and *intention* to control it." (emphasis added). But this portion of the instruction, while a correct statement of the law, addresses "joint possession." Understandably, joint possession was never the Government's theory of the case given the nature of the evidence. Rather, the Government's theory was Defendant's exclusive possession of the shotgun. At least four times during its closing argument, the Government told the jury that given the shotgun's position on the floorboard of the backseat of the Buick, only Defendant had ready access to it.

24

ready to fire at the press of a trigger during the anticipated execution of a seemingly imminent drug transaction involving a substantial amount of methamphetamine compels us to conclude that *someone* had the intent to exercise control over the shotgun and use the weapon if needed to protect the drugs and cash that would exchange hands. *See United States v. Shannon*, 809 Fed. Appx. 515, 520 (10th Cir. 2020) (unpublished) ("The AR-15 was loaded, with its safety switch off, indicating an intent to use the weapon if needed[.]"). Unlike *Simpson*, *Benford*, *Giannukos*, and *Samora*—where the evidence pointed not only to the defendants, but also to wives, girlfriends, and roommates—the evidence in this case, albeit circumstantial, points to Defendant as that "someone," and no one else. *See United States v. Banks*, 884 F.3d 998, 1018 (10th Cir. 2018) ("The Government can, and ordinarily does, prove . . . intent through circumstantial evidence.").

While inside Defendant's garage just hours before the drug sale was set to occur, Lee testified he viewed the shotgun along with two handguns and a semi-automatic rifle in the backseat of Defendant's Buick. This was at a time when Defendant had exclusive control of his vehicle and its contents, including the four firearms.[4] Once Lee arranged to meet Jimmy that night, Defendant retrieved the two

---

[4] The record also contains evidence that on March 13, 2018, less than a month prior to Defendant's arrest, he sent the following text message to an individual referred to as "GMAN": "Hey are you home bought some guns and want to come up there and shoot[.]" *Cf. Benford*, 875 F.3d at 1020–21 ("[E]vidence that the defendant (continued...)

25

handguns from the backseat of the Buick and gave them to Lee, obviously as a precaution. Defendant left the shotgun and rifle undisturbed in his Buick. After supplying Lee with five pounds of methamphetamine, Defendant saw fit to travel with Lor, his driver, to the planned delivery point with the latter two firearms in Defendant's vehicle. The only reasonable inference was that Defendant was motivated to travel around seventy miles to the drug delivery point to protect his investment, i.e., the significant amount of methamphetamine he had supplied to Lee, but for which he had not received payment.

The evidence uncovered after his arrest indicates Defendant, while seated in the passenger's seat of the Buick, may have been preoccupied with trying to load the semi-automatic rifle as he and Lor approached the delivery point. Unlike the rifle, the shotgun was already fully loaded, chambered, and ready to fire at the press of a trigger. As shown in the Government's Trial Exhibit 9, law enforcement located the shotgun on the Buick's backseat floorboard with its shortened barrel extending well behind the driver's seat. As the old adage goes, "a picture is worth a thousand words." The shotgun's grip was positioned directly behind the front center console with its underside or trigger facing forward. Both Officers Wilmott and Silva

---

[4](...continued) actually handled a firearm outside the indictment period . . . may provide circumstantial evidence of the ability and intent to exercise control over the firearm necessary to establish constructive possession.").

testified—credibly from what Exhibit 9 shows—that the shotgun's placement made it readily accessible from the passenger's rather than the driver's seat. Defendant could simply turn to his left, grab the shotgun's handle with his right hand, and pull it directly up from behind the driver's seat. The same cannot be said for Lor, who would have had to expend valuable time twisting around and lifting the shotgun's barrel from behind his seat regardless of which hand he used.

At closing, Defendant's exclusive possession of the shotgun and WASR-10 was the theory on which the Government presented Count 3 to the jury. While delivering a PowerPoint presentation to the jury, the Government displayed a highlighted slide properly defining constructive possession as requiring "both the power and the intention at a given time to exercise dominion and control over an object." At the same time, the Government asked the jury to consider who intended to use the weapons recovered from Defendant's Buick:

> Now, take a look again at the crime scene photos and ask yourself who *intended* to use these weapons? Their positioning, who was *intending* to use these? It's [Defendant] Mr. Xiong. He's sitting next to one, almost on virtually on top of it, and he's the only one that can reach the other.

(emphasis added). *See Simpson*, 845 F.3d at 1062 (citing *Bader*, 678 F.3d at 869, for the proposition that the Government's closing argument may bear on whether an erroneous jury instruction was prejudicial).

Given the evidence in this case and the Government's argument to the jury

27

based on such evidence, Defendant has not persuaded us that the outcome of Count 3 would have been any different had the jury been properly instructed on constructive possession. Other than Lor's proximity to the shotgun, a proximity he shared with Defendant, *all* the evidence points to only one plausible conclusion: Though lacking physical custody of the short-barreled shotgun, Defendant retained the power *and* intent to exercise control over it. No reasonable probability exists that the jury would have concluded otherwise had it been properly instructed on constructive possession's intent requirement. Because Defendant has not satisfied his burden under plain error review, we affirm Defendant's conviction under 18 U.S.C. § 924(c)(1)(B)(i).

* * *

The judgment of the district court is AFFIRMED in its entirety.

28

GOVERNMENT
EXHIBIT
9
18-CR-243-CVE